Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CREDIT SUISSE FIRST BOSTON
CORPORATION, a Massachusetts
corporation,
            *Plaintiff-Appellee,*

        v.

MICHAEL SCOTT GRUNWALD, a
California resident,
            *Defendant-Appellant.*

No. 03-15695

D.C. No.
CV-02-02051-SBA

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
December 2, 2003—San Francisco, California

Filed March 1, 2005

Before: Edward Leavy, Richard A. Paez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Paez;
Concurrence by Judge Berzon

## COUNSEL

Michael Blumenfeld, Los Angeles, California, argued the case for the appellant, and Todd M. Lander, Los Angeles, California, assisted on the briefs.

Michael D. Early, San Francisco, California, argued the case for the appellee, and Dena L. Narbaitz, San Francisco, California, and Suzy C. Douglass, San Francisco, California, assisted on the briefs.

Mark A. Perry, Washington, D.C., argued the case for amicus curiae NASD Dispute Resolution, Inc., and Douglas W. Henkin, New York, New York, for amicus curiae New York Stock Exchange, Inc., assisted on the joint brief of NASD and NYSE in support of affirmance.

Michael C. Tilner and David S. Ettinger, Encino, California, submitted an amicus curiae brief on behalf of the Judicial Council of California.

Eric Summergrad, Washington, D.C., Deputy Solicitor for the SEC, submitted the Statement of the Securities and Exchange Commission, *amicus curiae*, in Support of the Position of the plaintiff-appellee.

## OPINION

PAEZ, Circuit Judge:

In this appeal we decide whether California's recently-adopted ethics standards for neutral arbitrators apply to arbi-

trations conducted in California by the National Association of Securities Dealers ("NASD"). We conclude that the California legislature intended the new ethics standards to apply to NASD-appointed neutral arbitrators. We hold, however, that the Securities and Exchange Act of 1934 ("Exchange Act"), as amended, preempts application of California's ethics standards to NASD arbitrations. In so holding, we further conclude that NASD rules approved by the Securities and Exchange Commission have preemptive force over conflicting state law. Accordingly, we affirm.

## I.

This appeal arises out of an employment dispute between Scott Grunwald and his former employer, Credit Suisse First Boston ("CSFB"). After CSFB terminated Grunwald from his position as Director of CSFB's Technology Private Client Services Program, Grunwald exhausted CSFB's internal grievance procedures and mediated his dispute with CSFB through JAMS/Endispute—the initial steps required by CSFB's Employment Dispute Resolution Program ("EDRP"). Grunwald then filed a demand for arbitration with the American Arbitration Association ("AAA"). CSFB, however, successfully obtained a preliminary injunction in district court that enjoined Grunwald from arbitrating before the AAA. The court granted the preliminary injunction on the ground that CSFB's EDRP required employees registered with the NASD, like Grunwald, to arbitrate before a NASD-appointed arbitration panel. Grunwald responded to the preliminary injunction by filing a demand for arbitration with the NASD.

Before the NASD appointed Grunwald's arbitration panel, the California Judicial Council[1] adopted heightened disclosure

---

[1] "Article VI, section 6 of the California Constitution requires the [California Judicial Council] to improve the administration of justice by . . . [a]dopting rules for court administration and rules of practice and procedure that are not inconsistent with statute . . . ." Cal. R. Ct. 6.1(b).

and disqualification standards for "neutral arbitrators." *See* Ethics Standards for Neutral Arbitrators in Contractual Arbitration, Cal. Rules of Court, appen., Div. VI (hereinafter "California Ethics Standards"). The NASD, however, determined that the California Ethics Standards should not apply to NASD arbitrations because the standards conflicted with the NASD's own rules that had been approved by the Securities and Exchange Commission. Consequently, the NASD immediately suspended the appointment of arbitrators in California when the California Ethics Standards went into effect on July 1, 2002. On August 6, the NASD announced that it would recommence arbitrations initiated in California, but only on the express condition that all parties agreed to arbitrate outside of California.[2] In September, the NASD gave California parties the additional option of waiving the California Ethics Standards and proceeding with arbitration in California.[3] In connection with this waiver policy, the NASD successfully sought Commission approval of a new rule[4] requiring industry

---

[2]Memorandum from Laura J. Hartt, Senior Attorney, NASD, to Parties and Counsel of Record (Aug. 6, 2002).

[3]Letter from Robert R. Glauber, Chairman and C.E.O. of NASD, to SEC Chairman Harvey L. Pitt (Sept. 19, 2002).

[4]NASD Rule IM-10100(f); Self-Regulatory Organizations; Notice of Filing and Order Granting Accelerated Approval of Proposed Rule Change by National Association of Securities Dealers, Inc. To Require Industry Parties in Arbitration To Waive Application of Contested California Arbitrator Disclosure Standards, Upon the Request of Customers and Associated Persons With Claims of Statutory Employment Discrimination, for a Six-Month Pilot Period, 67 Fed. Reg. 62,085 (Oct. 3, 2002) (hereinafter "Industry Party Waiver Rule"); Self-Regulatory Organizations; Notice of Filing and Immediate Effectiveness of Proposed Rule Change by the National Association of Securities Dealers, Inc. To Extend for an Additional Six-Month Period a Pilot Rule To Require Industry Parties in Arbitration To Waive Application of Contested California Arbitrator Disclosure Standards, Upon the Request of Customers and Associated Persons With Claims of Statutory Employment Discrimination, 68 Fed. Reg. 17,713 (Apr. 10, 2003); Self-Regulatory Organizations; Notice of Filing and Immediate Effectiveness of Proposed Rule Change by the National Association of Securities Dealers, Inc. To Extend, for an Additional Six-Month Period, a Pilot Rule Regarding Waiver of California Arbitrator Disclosure Standards, 68 Fed. Reg. 57,494 (Oct. 3, 2003); 69 Fed. Reg. 17,010 (Mar. 31, 2004); 69 Fed. Reg. 58,567 (Sept. 30, 2004) (hereinafter "September 30, 2004 Industry Party Waiver Rule").

parties to NASD arbitrations in California to waive the California Ethics Standards upon waiver of these standards by investors or associated persons. Because Grunwald qualified as an associated person, the Commission-approved waiver rule would have required CSFB to waive the California Ethics Standards if Grunwald had chosen to waive the standards.[5]

Grunwald, however, refused to waive the California Ethics Standards and declined the NASD's offer to proceed with arbitration outside of California. Grunwald then requested that the district court grant him leave to file a motion to reconsider the preliminary injunction. He argued that the NASD's suspension of arbitrations in California undermined his right to an expeditious arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. He also asserted that the NASD's waiver option amounted to a coerced waiver of his right to have his arbitration conducted pursuant to the California Ethics Standards. Grunwald's motion sought modification or dissolution of the preliminary injunction so that he could re-file his claims in state court or with the AAA.

The district court permitted Grunwald to file his motion for reconsideration, but ultimately denied the motion. In refusing to modify or dissolve the preliminary injunction, the district court determined that the California Ethics Standards did not apply to NASD arbitrators because the standards apply only to "neutral arbitrators" appointed directly by the parties. Thus, Grunwald did not have a right to have his NASD arbitration conducted pursuant to the requirements of the California Ethics Standards. Additionally, the district court determined that there was no right to a speedy and expeditious arbitration

---

[5]Any "natural person who is registered or has applied for registration" with the NASD is an "associated person." By-laws of the NASD, Art. I(dd). Grunwald qualifies as an associated person because he was registered with the NASD. We also note that the waiver rule applies to associated persons like Grunwald that have been terminated. September 20, 2004 Industry Party Waiver Rule, 69 Fed. Reg. at 58,567 n.7.

under the FAA. Even if such a right existed, the district court held that Grunwald could obtain a speedy arbitration by submitting to arbitration outside California or by waiving application of the California Ethics Standards to his NASD arbitration. Finally, the district court determined that the FAA precluded invalidation of the parties' agreement to arbitrate their employment dispute before the NASD. Grunwald filed a timely appeal from the district court's order denying his motion for reconsideration of the preliminary injunction.

## II.

We begin by considering four jurisdictional objections raised by CSFB. Because the district court's order was an "[i]nterlocutory order[ ] . . . refusing to dissolve or modify [the] injunction[ ]," 28 U.S.C. § 1292(a)(1), we have jurisdiction over this appeal.

## A.

Initially, CSFB contends that Grunwald's motion for reconsideration was untimely because it was filed some ninety days after the district court granted the preliminary injunction. CSFB points out that a motion to alter or amend a judgment must be filed within ten days of the entry of the judgment. Fed. R. Civ. P. 59(e). CSFB also correctly states that this ten-day time limit applies to motions for reconsideration of a preliminary injunction order.[6] *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1419 (9th Cir. 1984). Consequently, if Grunwald's motion was not based on events that occurred after the district court granted the preliminary

---

[6]Rule 59(e) applies to "[a]ny motion to alter or amend a judgment," and under Rule 54(a), a *judgment* is defined to include "any order from which an appeal lies." Because 28 U.S.C. § 1292(a)(1) establishes appellate jurisdiction over an appeal from a preliminary injunction, a preliminary injunction order is a "judgment" and is therefore subject to Rule 59(e)'s ten-day time limit on motions for reconsideration.

injunction, the motion would be untimely because it was filed well after the ten-day time limit.

Although a motion for reconsideration is subject to Rule 59(e)'s ten-day time limit, there is no time limit on a motion to vacate or dissolve a preliminary injunction. Federal Rule of Civil Procedure 54(b) states that a district court can modify an interlocutory order "at any time" before entry of a final judgment, and we have long recognized "the well-established rule that a district judge always has power to modify or to overturn an interlocutory order or decision while it remains interlocutory." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963).

**[1]** In determining whether a motion requesting the district court to reconsider its preliminary injunction should be treated as a motion for reconsideration under Rule 59 or a motion for dissolution or modification under Rule 54, we agree with the Third Circuit that "we must look beyond the motion's caption to its substance." *Favia v. Ind. Univ. of Pa.*, 7 F.3d 332, 337 (3d Cir. 1993); *see also Ortho Pharm. Corp. v. Amgen, Inc.*, 887 F.2d 460, 463 (3d Cir. 1989) ("We agree with Amgen that we must determine from its substance and not from its form whether we should treat Ortho's motion as a motion for reconsideration under Fed. R. Civ. P. 59(e) or a motion to modify a preliminary injunction under Fed. R. Civ. P. 62(c)."). While "[t]he purpose of a motion to reconsider under Fed. R. Civ. P. 59(e) is to relitigate the 'original issue,'" *Ortho*, 887 F.2d at 463, "[a] motion to modify a preliminary injunction is meant only to relieve inequities that arise after the original order." *Favia*, 7 F.3d at 338. Thus, a motion that merely seeks to relitigate the issues underlying the original preliminary injunction order is subject to Rule 59(e)'s ten-day limit, while a motion that in substance is based on new circumstances that have arisen after the district court granted the injunction may be filed at any time before entry of a final judgment.

If we did not look at the substance of the motion, a preliminary injunction would forever be subject to challenge and appeal. *See Sierra On-Line*, *Inc.*, 739 F.2d at 1418 n.4. In *Sierra On-Line*, the appellant conceded that it had presented no new matter in its motion for reconsideration. We declined to treat the district court's order denying the motion for reconsideration as an order refusing to dissolve the preliminary injunction, explaining:

> "The evident purpose of [Section 1292(a)(1)] is to permit review of orders made in response to claims of changed circumstances, not to extend indefinitely the time for appeal from a preliminary injunction by the simple device of seeking to vacate it or modify it." 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure § 3924, at 88 (1977). As a general rule, therefore, the denial of a motion to modify or dissolve an injunction, or to reconsider a request for an injunction, will be appealable only if the motion raises new matter not considered when the injunction was first issued.

*Id*. Thus, our task is to determine whether the substance of Grunwald's motion was based on changed circumstances.

**[2]** Grunwald's motion indeed "raise[d] new matter not considered when the injunction was first issued." *Id*. The California Ethics Standards were implemented after the district court granted the preliminary injunction. The NASD also suspended arbitrations in California, absent waiver of the California Ethics Standards, after the district court had issued the preliminary injunction. Grunwald's motion alleged that these post-injunction events deprived him of his right to a speedy arbitration, as well as his right to have his arbitration conducted pursuant to the requirements of the California Ethics Standards. Thus, Grunwald's motion was based on circumstances that occurred after the court granted the preliminary injunction. Consequently, Grunwald's "Motion for Reconsid-

eration" was, in substance, a motion to vacate or dissolve the injunction based on changed circumstances.

**[3]** In light of the nature of Grunwald's motion, we conclude that it was timely filed. As we explained above, a motion to vacate or dissolve an injunction based on changed circumstances is not subject to the ten-day time limit in Rule 59(e). Because Grunwald's motion alleged changed circumstances and did not simply seek to relitigate the issues decided by the district court when it granted the preliminary injunction, Grunwald was not required to file his motion within the ten-day period established by Rule 59(e). Consequently, Grunwald's motion, although filed some ninety days after the district court granted the preliminary injunction, was timely.

## B.

CSFB next argues that this appeal is moot because Grunwald dismissed his claim before the AAA, and commenced arbitration of his claim before the NASD. Although a "party moving for dismissal on mootness grounds bears a heavy burden," *Coral Constr. Co. v. King County*, 941 F.2d 910, 927-28 (9th Cir. 1991), CSFB fails to explain why these events render Grunwald's appeal moot. If Grunwald had obtained the relief he sought in his motion for reconsideration, the preliminary injunction order would have been modified to permit Grunwald to proceed with arbitration before the AAA or to file his case in state court. Because there is no showing that Grunwald's claims before the AAA were dismissed with prejudice, he would still be able to re-file his claims with the AAA. In any event, Grunwald also requested that the district court modify the preliminary injunction to allow him to file his claims in state court. Because the outcome of this appeal will determine whether Grunwald can pursue arbitration with the AAA or file his case in state court, this is not a situation where "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v.*

*McCormack*, 395 U.S. 486, 496 (1969). Therefore, we conclude that this appeal is not moot.

## C.

Next, CSFB argues that Grunwald is improperly attempting to obtain judicial review of the NASD's rule changes. However, as even CSFB appears to recognize, Grunwald only seeks to vindicate an alleged right to have his arbitration conducted in accordance with the California Ethics Standards. Grunwald may lack such a right, but that is a question that goes to the merits of this appeal, not to our jurisdiction.

## D.

Finally, CSFB asserts that Grunwald's appeal from the district court's denial of his motion for reconsideration fails to satisfy the criteria for an interlocutory appeal under § 1292(a)(1). CSFB reasons that an appellant can only bring an interlocutory appeal when "fundamental rights" are at stake, and contends that arbitrator-disclosure rules do not implicate fundamental rights. There is no requirement, however, in § 1292(a)(1) that an appeal from an interlocutory order be premised on a fundamental right. Consequently, we conclude that we have jurisdiction, and we turn to the merits of Grunwald's appeal.

## III.

The district court concluded that the Judicial Council had exceeded its statutory authority by applying the California Ethics Standards to arbitrators appointed by a dispute resolution provider organization ("DRPO") like the NASD because the California Legislature only authorized the adoption of ethics standards for arbitrators jointly selected by the parties.[7]

---

[7]We review for abuse of discretion the district court's decision denying the motion to modify or dissolve the preliminary injunction. *Miller ex rel.*

"Because the California Supreme Court has not addressed" whether the Judicial Council acted within its authority in this instance, "our task is to 'predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.' " *Walker v. City of Lakewood*, 272 F.3d 1114, 1125 (9th Cir. 2001) (quoting *NLRB v. Calkins*, 187 F.3d 1080, 1089 (9th Cir. 1999)).[8]

In interpreting the California statute at issue here, we look to California principles of statutory construction. *Neilson v. Chang* (*In re First T.D. & Investment, Inc.*), 253 F.3d 520, 527 (9th Cir. 2001). These principles require us to " 'ascertain the intent of the Legislature so as to effectuate the purpose of the law' " by looking first to the words of the statute. *State Farm Mut. Auto. Ins. Co. v. Garamendi*, 88 P.3d 71, 78 (Cal. 2004) (citations omitted). We utilize the ordinary meaning of words in a statute unless the Legislature has defined the terms. *Sec. Pac. Nat'l Bank v. Wozab*, 800 P.2d 557, 561 (Cal. 1990). " 'It is axiomatic that in the interpretation of a statute

---

*NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 (9th Cir. 1994) (en banc). A district court abuses its discretion when it bases its decision on an erroneous legal standard. *Sierra On-Line*, 739 F.2d at 1421. Consequently, we review *de novo* any underlying issues of law, *Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996), including the district court's interpretation of California state law. *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 665 (9th Cir. 2003).

[8]We recognize that the California Court of Appeal addressed this issue of California law in *Jevne v. Superior Court*, 6 Cal. Rptr. 3d 542 (Ct. App. 2003). The California Supreme Court, however, recently granted review in *Jevne* thereby superceding the opinion of the California Court of Appeal. 11 Cal. Rptr. 3d 222 (2004). Under California Rules of Court, a superceded opinion is not considered published, and an unpublished opinion cannot be cited to or relied on by other courts. Cal. R. Ct. 976, 977. In short, an unpublished opinion does not constitute binding precedent. Accordingly, we are not bound by the *Jevne* court's analysis of California law. *See Aeroquip Corp. v. Aetna Cas. & Sur. Co.*, 26 F.3d 893, 894 n.1 (9th Cir. 1994) (per curiam) (disregarding a California Court of Appeals decision because it had been ordered depublished).

where the language is clear, its plain meaning should be followed.' " *Id.* (citation omitted). This "plain meaning" rule, however, "does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute." *Lungren v. Deukmejian*, 755 P.2d 299, 304 (Cal. 1988). Thus, "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." *Id.* In the event the letter of the law is ambiguous, California law requires us to examine the legislative history for further guidance. *Hughes v. Bd. of Architectural Exam'rs*, 952 P.2d 641, 649 (Cal. 1998) (per curiam).

**[4]** The California statute authorizing the Judicial Council to adopt new ethics standards specified that "[t]he Judicial Council shall adopt ethical standards for all *neutral arbitrators* effective July 1, 2002." Cal. Civ. Proc. Code § 1281.85(a) (emphasis added). Thus, the California legislature authorized the Judicial Council to adopt ethics standards only for "neutral arbitrators," a term that is defined by statute to mean:

> an arbitrator who is (1) selected jointly by the parties or by the arbitrators selected by the parties or (2) appointed by the court when the parties or the arbitrators selected by the parties fail to select an arbitrator who was to be selected jointly by them.

Cal. Civ. Proc. Code § 1280(d). The California Ethics Standards explicitly apply to arbitrators appointed by DRPOs. Standard 2(a)(1)(C).[9] However, the Judicial Council may not

---

[9]Under the California Ethics Standards, "neutral arbitrator" is defined to mean:

> any arbitrator who is subject to these standards and who is to serve impartially, whether selected or appointed: (A) Jointly by the parties or by the arbitrators selected by the parties;

act "inconsistent with the governing statutes." *People v. Hall*, 883 P.2d 974, 980 (Cal. 1994). Thus, the only question is whether the Judicial Council exceeded its authority when it required DRPO-appointed arbitrators to comply with the new standards.

**[5]** The district court held that because section 1281.85 plainly applies only to "neutral arbitrators" as defined by section 1280, it could not apply to DRPO-appointed arbitrators. Although we agree with the district court's determination that section 1281.85 permitted the Judicial Council to adopt ethics standards only for neutral arbitrators, we disagree with its unjustified assumption that all DRPO-appointed arbitrators are not neutral arbitrators. As section 1280 sets forth, an arbitrator qualifies as a neutral arbitrator if he is "selected jointly by the parties."

**[6]** Under the NASD's Code of Arbitration Procedure ("NASD Code"), the parties jointly select the arbitrators that serve on the panel. After receiving a list of potential arbitrators, "[a] party may strike one or more of the arbitrators from each list for any reason." NASD Code § 10308(c)(1)(A). The parties then rank order all of the remaining arbitrators. *Id.* § 10308(c)(1)(B), (C). Next, the NASD's Director of Arbitration adds the parties' rankings together, and must appoint the arbitrators that have the best consolidated rankings, subject only to availability and disqualification. *Id.* § 10308(c)(3), (4). Because the parties have unlimited strikes and the power to choose the arbitrators through the consolidated ranking pro-

---

(B) By the court, when the parties or the arbitrators selected by the parties fail to select an arbitrator who was to be selected jointly by them; or

(C) *By a dispute resolution provider organization, under an agreement of the parties.*

Standard 2(a) (emphasis added).

cess, we conclude that NASD arbitrators are "selected jointly by the parties" and therefore qualify as "neutral arbitrators." *See* Cal. Civ. Proc. Code § 1280.

**[7]** Because NASD arbitrators are "neutral arbitrators" within the meaning of section 1280, section 1281.85 authorized the Judicial Council to adopt ethics standards that would be applicable to NASD arbitrators. The Judicial Council therefore did not exceed its authority by requiring DRPOs, like the NASD, to comply with the California Ethics Standards. Accordingly, contrary to the district court's ruling, we hold that the Judicial Council did not act *ultra vires* by subjecting NASD arbitrators to the new ethics standards. For a different reason, however, we agree with the district court's ultimate conclusion that the new ethics standards cannot be applied to NASD arbitrators.

## IV.

CSFB contends that the Exchange Act preempts application of the California Ethics Standards to NASD-appointed arbitrators. We agree.

**[8]** Under the Supremacy Clause, federal laws preempt conflicting state laws. U.S. CONST., art. VI, cl. 2. Federal regulations issued by an agency in the scope of its congressionally-delegated authority are included among the "Laws of the United States" which can preempt state law. *City of New York v. FCC*, 486 U.S. 57, 63-64 (1988). We deal here, however, with rules adopted by private entities—self-regulatory organizations ("SROs") within the securities industry—rather than federal agencies. The Exchange Act "delegated government power" to SROs such as the New York Stock Exchange ("NYSE") and the NASD "to enforce . . . compliance by members of the industry with both the legal requirements laid down in the Exchange Act and ethical standards going beyond those requirements." S. Rep. No. 94-75, at 23 (1975), *reprinted in* 1975 U.S.C.C.A.N. 179, 201.

**[9]** Whether SRO rules can preempt conflicting state laws is an issue that we have not addressed. In *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, however, the Supreme Court suggested by implication that SRO rules can in certain circumstances have preemptive force despite the fact that they are adopted and enforced by private organizations. 414 U.S. 117, 127 (1973) ("[C]onflicting law . . . should be pre-empted by exchange self-regulation 'only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act.' " (quoting *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 361 (1963))). In light of the Supreme Court's *Ware* decision and the 1975 Amendments to the Exchange Act, we conclude that SRO rules approved by the Commission preempt conflicting state law. Because the NASD arbitration rules at issue here were approved by the Commission and because the California Ethics Standards conflict with the NASD arbitration disclosure rules, the California Ethics Standards are preempted by the NASD rules.

## A.

The Securities Exchange Act of 1934 created a system of supervised self-regulation in the securities industry whereby organizations such as the NASD or the NYSE could promulgate their own governing rules and regulations, subject to oversight by the Securities and Exchange Commission. The original version of the statute gave SROs considerable latitude to fashion their own governing rules. S. Rep. No. 73-792, at 5 (1934). The Commission was authorized to take action only when "necessary or appropriate for the protection of investors or to insure fair dealing . . . ." 15 U.S.C. § 78s(b) (1934).

This system gave rise to questions regarding the preemptive effect of SRO rules, issued by private organizations although sanctioned by federal law, over conflicting state law. The Supreme Court addressed this issue in 1973 in *Ware* and articulated a standard to determine when SRO rules would preempt state law. 414 U.S. at 125, 130-31. Merrill Lynch argued

that a NYSE rule providing for compulsory arbitration preempted a California state law that afforded employees a right of action for unpaid wages regardless of any private agreement to arbitrate. The Court disagreed, and instead held that state law applied. *Id*. at 138-39.

As the Court explained, Congress's aim in providing for supervised self-regulation was "to insure fair dealing and to protect investors from harmful or unfair trading practices." *Id*. at 130. SRO rules that contradicted this policy were subject to Commission supervision. Conversely, however, "any rule or practice not germane to fair dealing or investor protection would not appear to fall under the shadow of the federal umbrella; it is, instead, subject to applicable state law." *Id*. at 130-31. Because the arbitration rules at issue were insufficiently related to fair dealing or the protection of investors, the Court concluded that they fell outside the federal shadow. *Id*. at 135 ("[T]he relationship between compulsory employer-employee arbitration and fair dealing and investor protection is 'extremely attenuated and peripheral, if it exists at all.' " (citation omitted)).

The Court's decision in *Ware* emphasized that the limited authority granted to the Commission under the 1934 Exchange Act was central to its preemption analysis. *Id*. at 349; *see also Perry v. Thomas*, 482 U.S. 483, 490 (1987); *Silver*, 373 U.S. at 358 n.12 ("Were there Commission jurisdiction and ensuing judicial review for scrutiny of a particular exchange ruling, . . . a different case would arise concerning exemption from the operation of laws . . . , an issue we do not decide today."). The authority to adopt self-governing rules was vested in the SROs, and as Congress put it, "[i]t is only where [SROs] fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so." S. Rep. No. 73-792, at 13; *see also Ware*, 414 U.S. at 130. The Commission's ability to scrutinize SRO rules was confined to designated subject areas,[10] and the direct

---

[10]The Commission was authorized to compel SROs to amend their rules relating to the following areas:

supervisory power the Commission did enjoy was exercised "sparingly." *Ware*, 414 U.S. at 129-30.

It was in this context of the Commission's limited regulatory control over the SROs and the SROs' substantial rulemaking latitude that the Court decided *Ware*. The arbitration rule at issue, in fact, clearly "would not [have been] subject to the Commission's modification or review" under the 1934 Exchange Act. *Id.* at 135. The Court explained that because the Exchange Act's self-regulatory scheme provided for no agency check on SRO behavior in some cases, state laws could operate as a beneficial " 'form of review of exchange self-policing . . . .' " *Id.* at 137 (quoting *Silver*, 373 U.S. at 359).

Just two years after the Supreme Court decided *Ware*, however, Congress initiated a major overhaul of the Exchange Act and drastically shifted the balance of rulemaking power in favor of Commission oversight. Securities Acts Amendments

---

(1) safeguards in respect of the financial responsibility of members and adequate provision against the evasion of financial responsibility through the use of corporate forms or special partnerships; (2) the limitation or prohibition of the registration or trading in any security within a specified period after the issuance or primary distribution thereof; (3) the listing or striking from listing of any security; (4) hours of trading; (5) the manner, method, and place of soliciting business; (6) fictitious or numbered accounts; (7) the time and method of making settlements, payments, and deliveries and of closing accounts; (5) the reporting of transactions on the exchange and upon tickers maintained by or with the consent of the exchange, including the method of reporting short sales, stopped sales, sales of securities of issuers in default, bankruptcy or receivership, and sales involving other special circumstances; (9) the fixing of reasonable rates of commission, interest, listing, and other charges; (10) minimum units of trading; (11) odd-lot purchases and sales; (12) minimum deposits on margin accounts; and (13) similar matters.

15 U.S.C. § 78s(b) (1934).

of 1975, Pub. L. No. 94-29, 89 Stat. 168 (codified as amended at 15 U.S.C. § 78a to 80b-4 (1975)). The amendments were intended to work "a fundamental reform of the economic and regulatory structure of the securities markets and the securities industry." S. Rep. No. 94-75, at 1. Under the amended statute, the Commission "play[s] a much larger role than it has in the past . . . ." *Id.*

**[10]** After the 1975 Amendments, the SROs' "authority to regulate independently of the SEC's control" was substantially curtailed. *Id.* at 23. This limitation on the SROs' rule-making authority was accomplished by requiring SROs to file a proposed rule with the Commission, along with a policy statement justifying the basis and purpose for the proposed rule. 15 U.S.C. § 78s(b)(1). The Commission must give public notice of the proposed rule and provide an opportunity for comment. *Id.* With the enhanced supervisory role of the Commission, SROs are no longer free to adopt new substantive rules or modify existing rules at any time as they could prior to the amendments. S. Rep. No. 94-75, at 30. "No proposed rule change shall take effect unless approved by the Commission[,]" 15 U.S.C. § 78s(b)(1);[11] moreover, the Commission must give public notice of the specific reasons for its approval. S. Rep. No. 94-75, at 30.

---

[11]A proposed SRO rule may take effect upon filing, without Commission approval, where the SRO designates the rule as

> (i) constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing rule of the self-regulatory organization, (ii) establishing or changing a due, fee, or other charge imposed by the self-regulatory organization, or (iii) concerned solely with the administration of the self-regulatory organization . . . .

15 U.S.C. § 78s(b)(3)(A); *see also* 17 C.F.R. § 240.19b-4. The statute, however, specifies that such "housekeeping" rules must not be inconsistent with applicable federal and state law. The Commission also retains the authority to summarily abrogate the rule within sixty days of filing and require the SRO to refile it in accordance with the approval procedures of § 78s(b)(2). 15 U.S.C. § 78s(b)(3)(C).

The ultimate approval of a proposed SRO rule reflects the Commission's determination that the proposed rule is consistent with the purposes of the Exchange Act. 15 U.S.C. § 78s(b)(2); *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 233 (1987) ("No proposed rule change may take effect unless the SEC finds that the proposed rule is consistent with the requirements of the Exchange Act . . . ."). Moreover, the 1975 Amendments gave the Commission the power to abrogate, add to, and delete from the rules of any SRO "as the Commission deems necessary or appropriate to insure the fair administration of the self regulatory organization . . . ." 15 U.S.C. §78s(c). Unlike the restrictions in the original statute, this new authority is not limited to specific subject matter areas.[12] S. Rep. No. 94-75, at 27-28, 31. The Commission's expanded authority includes, for example, "the power to mandate the adoption of any rules [the Commission] deems necessary to ensure that arbitration procedures adequately protect statutory rights." *Shearson/Am. Express, Inc.*, 482 U.S. at 234.

Finally, the 1975 Amendments removed the original statute's explicit requirement that all SRO rules be consistent with "the applicable laws of the State in which [the exchange] is located . . . ." 15 U.S.C. § 78f(c) (1934). By contrast, the current statute requires that SRO rules be "not inconsistent with . . . applicable Federal and State law" *only* when they are promulgated as either administrative, "housekeeping" matters that do not require Commission approval (under § 78s(b)(3)(A)), or when they are temporary rule changes instituted summarily by the Commission (under § 78s(b)(3)(B)). The mandated approval process under § 78s(b)(2) does not contain a similar requirement that SRO rules be consistent with state law.

**[11]** These new provisions for Commission approval are "now the 'measure of congressionally delegated authority for self-regulation in the national interest . . . .' " *Drayer v. Kras-*

---

[12]*See supra* note 10.

*ner*, 572 F.2d 348, 358 (2d Cir. 1978). Section 78s(b)(2) provides for vastly expanded Commission oversight and requires that SRO rules promote the federal objectives of the Exchange Act. Commission approval of an SRO rule under the new § 78s(b)(2) therefore satisfies *Ware*'s requirement that a rule be germane to fair dealing or investor protection and fall under the shadow of the federal umbrella; indeed, the Commission is in fact obligated "to refrain from imposing, or permitting to be imposed, any new regulatory burden 'not necessary or appropriate in furtherance of the purposes' of the Exchange Act." *Drayer*, 572 F.2d at 358 (quoting H.R. Conf. Rep. No. 94-229, at 94 (1975), *reprinted in* 1975 U.S.C.C.A.N. 321, 325).[13]

The Supreme Court has expressly withheld any opinion regarding the effect of the 1975 Amendments on *Ware*'s holding and the preemptive effect of SRO arbitration rules approved under § 78s(b)(2). *Perry*, 482 U.S. at 487 n.5. But our decision here is consistent with the Second Circuit's analysis in *Drayer*, decided not long after the effective date of the 1975 Amendments. 572 F.2d at 358. Drayer's wrongful termination claim against his employer, a member of the NYSE, was stayed pending arbitration in accordance with NYSE rules. *Id.* at 350. The Second Circuit affirmed the district court's confirmation of the arbitration award, concluding that

---

[13]Although we agree with the Second Circuit's analysis, *Drayer* skipped over one point that we believe was central to its analysis. The 1975 Amendments require, as a condition of SRO registration, that "[t]he rules of the [SRO] . . . are not designed . . . to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the [SRO]." 15 U.S.C. §§ 78f(b)(5), 78*o*-3(b)(6); *see also* S. Rep. No. 94-75, at 28 ("[The Act] would limit by [these sections] the scope of the self-regulatory organizations' authority over their members to matters related to the purposes of the Exchange Act."). Because the SEC may only approve SRO rules if "it finds that [the rule] is consistent with the requirements" of the Exchange Act, 15 U.S.C. § 78s(b)(2), any rule properly approved by the SEC is necessarily related to "the purposes of [the Exchange Act] or the administration of the [SRO]."

the NYSE compulsory arbitration rule was within the area of supervised self-regulation contemplated by the Exchange Act. *Id.* at 356.

The court in *Drayer* concluded that *Ware*'s specific holding —that compulsory arbitration fell outside the Exchange Act's purposes—was abrogated by the 1975 Amendments. *Id.* at 357. As the court explained, the 1975 Amendments expanded the "federal umbrella" such that the compulsory arbitration rule now falls within the Act's reach as "germane to the goal of market efficiency . . . and to the objective of fair adminis-tration of the Exchange . . . ." *Id.* at 358.

Having recognized the significance of the 1975 Amend-ments, the court in *Drayer* held that the NYSE employment arbitration rules were within the purposes of the Exchange Act even though the Commission had at that time never spe-cifically reviewed those rules. *Id.* The fact that the Commis-sion had the opportunity for involvement—even though it had not exercised that power—was sufficient to satisfy *Ware*'s requirements.

Since the Second Circuit decided *Drayer*, however, the Commission has issued an affirmative statement of approval for the SRO arbitration rules. In 1989, the SROs overhauled their arbitration procedures. "[T]he SEC . . . specifically approved the arbitration procedures of . . . the NASD" after a period of public notice and comment, in line with the Exchange Act's requirements. *Shearson/Am. Express, Inc.* 482 U.S. at 234. This, of course, included a thorough review and eventual approval of the NASD Code's disclosure and disqualification rules.[14]

---

[14]Self-Regulatory Organizations; Order Approving Proposed Rule Changes by the New York Stock Exchange, Inc., National Association of Securities Dealers, Inc., and the American Stock Exchange, Inc. Relating to the Arbitration Process and the Use of Predispute Arbitration Clauses, 54 Fed. Reg. 21,144 (May 16, 1989) (hereinafter "1989 Order Approving Proposed Rule Changes").

The Commission worked closely with the Securities Industry Conference on Arbitration, a group composed of representatives from each SRO that had an arbitration program, a representative of the securities industry, and three or four public representatives, to develop the SROs' arbitrator-disclosure rules.[15] In addition, with respect to the current controversy, the Commission directed a special study to examine whether the SROs should amend their rules to incorporate the California Ethics Standards' disclosure and disqualification requirements. Michael A. Perino, Report to the Securities and Exchange Commission Regarding Arbitrator Conflict Disclosure Requirements in NASD and NYSE Securities Arbitrations, at 1 (Nov. 4, 2002) (hereinafter "Perino Report").[16] The Commission also has repeatedly approved the NASD's waiver rule, which requires industry parties to waive the California Ethics Standards if those standards are waived by an investor or an associated person.[17] 67 Fed. Reg. 62,085-88 (Oct. 3, 2002); *see also* 69 Fed. Reg. 58,567 (Sept. 30, 2004).

**[12]** In sum, we conclude that SRO rules that have been approved by the Commission pursuant to 15 U.S.C. § 78s(b)(2)[18] preempt state law when the two are in conflict, either directly or because the state law stands as an obstacle to the accomplishment of the objectives of Congress. Specifically, we hold that the NASD arbitration procedures in dispute here have preemptive force over conflicting state law.

---

[15]*See* 1989 Order Approving Proposed Rule Changes, *supra* note 14.

[16]The Perino Report is available at http://www.sec.gov/pdf/arbconflict.pdf.

[17]*See supra* note 4.

[18]We are not faced with the problem of preemption in the context of SRO "housekeeping" rules that do not require Commission approval and take effect upon filing pursuant to 15 U.S.C. § 78s(b)(3). Section 78s(b)(3) specifically provides that such a rule "may be enforced by [an SRO] to the extent it is not inconsistent with . . . applicable Federal and State law." 15 U.S.C. § 78s(b)(3)(C). Whether these rules can ever preempt conflicting state law is a question we leave for another day.

**B.**

As we previously noted, if a state law prevents the NASD from complying with its rules or if it interferes with the Congressional goals underlying the Exchange Act, the state law is preempted by federal law.[19] Preemption occurs "where it is impossible for a private party to comply with both state and federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Additionally, state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Thus, the Exchange Act preempts application of the California Ethics Standards to NASD-appointed arbitrators if it impossible for the NASD to comply with both its own rules and the Ethics Standards, or if the Ethics Standards would inhibit the achievement of Congressional objectives. *See Serv. Eng'g Co. v. Emery*, 100 F.3d 659, 661 (9th Cir. 1996). We will evaluate the disqualification rules and disclosure rules in turn.

## 1. Disqualification Rules

[13] The NASD cannot simultaneously comply with both the NASD Code's and the California Ethics Standards' disqualification rules. If an arbitrator fails to make a required disclosure, the California Ethics Standards provide for mandatory and automatic disqualification of the arbitrator once a party serves a timely notice of disqualification. Standard 10(a)(1). If the arbitrator fails to remove himself from the panel, the arbitration award can be vacated. Cal. Civ. Proc. Code § 1286.2(a)(6). In contrast, the NASD Code specifies that the Director of Arbitration "may" remove an arbitrator if

---

[19]The Exchange Act requires SROs like the NASD to "comply with . . . its own rules." 15 U.S.C. § 78s(g)(1); *see also Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1212 (9th Cir. 1998). Thus, if the NASD violates its own rules, it likewise violates federal law. By extension, if a state law makes it impossible for the NASD to comply with its own rules, that state law prevents the NASD from complying with federal law.

he fails to make a required disclosure. NASD Code § 10308(d)(2) ("[T]he Director may remove an arbitrator from an arbitration panel based on information that is required to be disclosed pursuant to Rule 10312 and that was not previously disclosed."). Thus, in the event of a failure to make a required disclosure, the California Ethics Standards require disqualification once a party serves a notice of disqualification, while the NASD Code grants discretion to the NASD Director of Arbitration to decide whether the arbitrator should be disqualified.

The NASD Director of Arbitration would find himself in a catch-22 if the California Ethics Standards applied to NASD arbitrations. If the NASD Director exercises his discretion under the NASD Code by refusing to dismiss an arbitrator that failed to make a required disclosure, the Director violates the California Ethics Standards' mandatory disqualification provision. *See* Standard 10(a)(1). Alternatively, if the Director determines that he is bound by the California Ethics Standards, he effectively forfeits his discretionary authority under the NASD Code. *See* NASD Code § 10308(d)(2).

**[14]** A similar conflict would arise if an arbitrator's disclosure revealed a possible conflict of interest. Again, under the California Ethics Standards, disqualification is mandatory and automatic if a party serves a timely notice of disqualification. Standard 10(a)(2); *see also Azteca Const., Inc. v. ADR Consulting, Inc.*, 18 Cal. Rptr. 3d 142, 146 (Ct. App. 2004) ("There is no good faith or good cause requirement for the exercise of this right, nor is there a limit on the number of proposed neutrals who may be disqualified in this manner."). But under the NASD Code, when a party objects to an arbitrator's appointment, the NASD Director of Arbitration "shall determine if the arbitrator should be disqualified." NASD Code § 10308(d)(1).[20] Likewise, the disclosure rule in the

---

[20]Although the NASD Director has the power to make the initial determination that an arbitrator should be disqualified, the parties can prevent

NASD Code also specifies that "[t]he Director *may* remove an arbitrator based on information that is required to be disclosed pursuant to this Rule." *Id.* § 10312(d) (emphasis added). Application of the California Ethics Standards to NASD arbitrations would strip the Director of Arbitration of his federally-recognized obligation to make a determination whether an arbitrator should in fact be disqualified. Because the NASD Director cannot comply with both sets of disqualification rules, the California Ethics Standards are preempted. *See Crosby*, 530 U.S. at 372.

## 2.  Disclosure Rules

**[15]** In contrast to the disqualification rules, it is not physically impossible for a party to simultaneously comply with the NASD Code and the California Ethics Standards. True, the California Ethics Standards' enumerated list of mandatory disclosures is more extensive than the NASD Code's disclosure rule. *Compare* Standard 7(d)(1)-(14),[21] *with* NASD Code § 10312(a);[22] *see also* Perino Report at 44 ("While the Cali-

---

the disqualification by unanimously agreeing that the arbitrator should not be disqualified. NASD Code § 10308(d)(1). Accordingly, even at this late stage of the arbitrator-selection process, the parties are still responsible for selecting their arbitrators, a fact which supports our conclusion that NASD arbitrators are "neutral arbitrators."

[21]Standard 7(d)(1)-(14) is set forth in the appendix to this opinion.

[22]The NASD requires its arbitrators to disclose:

(1) Any direct or indirect financial or personal interest in the outcome of the arbitration;

(2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances that are likely to affect impartiality or might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators should disclose any such relationships or circumstances that they have with any party or its counsel, or with any individual whom they have been told will be a witness. They should also disclose any such relationship or circumstances involving members of their families or their current employers, partners, or business associates.

NASD Code § 10312(a).

fornia Ethics Standards and the SRO rules clearly require disclosure of similar kinds of information, they are not co-extensive. [Standard 7(d)] requires disclosures that current rules do not."). For example, under the California Ethics Standards "an arbitrator could be subject to disqualification because her spouse used to serve on a bar committee with an associate of a party's lawyer, even if the associate is uninvolved in the case." Perino Report at 45.[23] Because such a remote relationship is completely unlikely "to affect impartiality" or to "reasonably create an appearance of partiality or bias," the NASD Code would not require this disclosure. *See* NASD Code § 10312(a)(2).

[16] Nonetheless, the two sets of disclosure standards do not actually conflict because it is "entirely possible" for an arbitrator to satisfy both sets of disclosure requirements without violating the NASD Code. *See Serv. Eng'g Co.*, 100 F.3d at 661 (holding that federal law did not preempt a state workers' compensation program because it was possible for a claimant to collect under both the federal and state programs). "While the state standards are more stringent than the federal standards, it is possible to comply with both." *North Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 583 (9th Cir. 1983). Nothing in the NASD Code prevents an arbitrator from disclosing more information than is required by the NASD Code's disclosure rule. *See* NASD Code § 10312(a). To the contrary, the NASD encourages its arbitrators to " 'bend over backwards' to avoid any appearance of bias" by opting for disclosure in close cases.[24] Thus, an arbitrator that discloses

---

[23]Standard 7(d)(8) requires the disclosure of "[a]ny other professional relationship . . . that the arbitrator or a member of the arbitrator's immediately family has or has had with a party or lawyer for a party." Standard (2)(m) defines "Lawyer for a party" to include the law firm and associates of the lawyer representing the party. Thus, read together, these two provisions require an arbitrator to disclose any professional relationship his spouse had with anyone associated with a party's lawyer's law firm.

[24]Perino Report at 14 (quoting Securities Industry Conference on Arbitration, The Arbitrator's Manual 5 (Jan. 2001)).

all of the information required by the California Ethics Standards may go beyond the call of duty, but he does not violate any rule contained in the NASD Code. The two sets of disclosure rules, while not coextensive, do not conflict.

We must, however, consider the second type of conflict preemption: whether application of the California Ethics Standards' disclosure requirements to NASD-appointed arbitrators would stand as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Crosby*, 530 U.S. at 373. This type of preemption naturally requires us to look to Congressional intent in enacting the Exchange Act, and determine whether state law would result in a "frustration of [this] purpose." *Serv. Eng'g Co.*, 100 F.3d at 661.

The Commission contends in its *amicus curiae* brief that the California Ethics Standards do interfere with Congressional goals for at least two reasons. First, permitting each state to regulate NASD arbitration procedures would create a patchwork of laws that would interfere with Congress's chosen approach of delegating nationwide, cooperative regulatory authority to the Commission and the NASD. Second, the Commission contends that the California Ethics Standards' extensive disclosure requirements may undermine the NASD arbitration system's protection of investors. As the Commission points out, its study of the California Ethics Standards concluded that the additional disclosure rules are unnecessary because empirical evidence reveals little evidence of bias in SRO arbitration outcomes, survey data suggests participants in SRO arbitrations perceive arbitrators as fair and unbiased, and SRO-arbitration awards are rarely challenged on the basis of arbitrator bias. Perino Report at 30-37.

At the same time, the added disclosure requirements could have a number of costs. First, they would increase the NASD's administrative costs because the NASD would have to create and maintain a more extensive database of informa-

tion on each of its arbitrators. These higher administrative costs will either be shouldered by the parties, thereby making arbitration more costly for investors and employees, or by the NASD, which would result in the NASD having fewer resources available for its other regulatory responsibilities. Second, the additional record-keeping requirements may deter well-qualified individuals from serving as NASD arbitrators, especially in light of the relatively low honorariums that NASD arbitrators receive.[25] *See id.* at 41 (concluding that the California Ethics Standards "may well deter many individuals from participating" in SRO arbitrations). Finally, the Commission expresses concern that the California Ethics Standards would "increase the complexity, cost, and uncertainty of the arbitration process" because of the potential for a party to seek an award's vacature under the California disclosure rules. As the Commission explains, these problems could significantly undermine a primary congressional purpose in enacting the Exchange Act—investor protection—because the average investor is less likely than the average brokerage firm to be able to afford the costs of protracted litigation. In sum, the Commission has taken the position in its *amicus curiae* brief that application of the California Ethics Standards disclosure requirements would create "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Crosby*, 530 U.S. at 373.

The Commission has extensive experience with regulating the SROs' arbitration procedures, and it is in a unique position to evaluate whether application of the California Ethics Standards to NASD arbitrations would frustrate the objectives of the Exchange Act. In short,

> [b]ecause the [Commission] is the federal agency to

---

[25]NASD honorarium rates are substantially lower than non-SRO arbitration compensation rates. NASD arbitrators receive $200 to $275 for each hearing session they attend, while non-SRO arbitrators receive $750 to $1,000 per day. Perino Report at 16.

> which Congress has delegated its authority to implement the provisions of the [Exchange Act], the agency is uniquely qualified to determine whether a particular form of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496 (1996) (footnote omitted) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Accordingly, we "place some weight upon" the Commission's conclusion that the California Ethics Standards conflict with the purposes of the Exchange Act. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000).

[17] The Commission has reasonably concluded that allowing California to regulate SRO arbitrations would result in a patchwork of inconsistent state arbitration regulations that would interfere with Congress's intent in delegating SRO regulatory authority to the Commission. Indeed, we have recognized that "allow[ing] states to define by common law the regulatory duties of [the NASD is] a result which cannot co-exist with the Congressional scheme of delegated regulatory authority under the Exchange Act." *Sparta Surgical Corp.*, 159 F.3d at 1215. There is also nothing "arbitrary, capricious, or manifestly contrary to statute" about the Commission's fear that the California Ethics Standards' disclosure rules would undermine the Exchange Act's goal of protecting investors and the public interest. *See Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1264 (9th Cir. 1996); *see also Geier*, 529 U.S. at 884. The only study that has examined the effects of applying the California Ethics Standards to NASD arbitrators concluded that California's disclosure rules were unnecessary and would increase the costs of NASD arbitrations. *See* Perino Report at 48. Because the Commission's determination that the state law conflicts with SRO rules is well-supported by the record, we conclude that the Exchange

Act preempts application of the California Ethics Standards' disclosure rules to NASD-appointed neutral arbitrators.[26]

## V.

In light of our holding that the California Ethics Standards cannot apply to NASD arbitrations because they are preempted by federal law, we also reject Grunwald's claims that the NASD and CSFB were attempting to coerce him to waive his rights under the California Ethics Standards and were depriving him of his right to a speedy arbitration. Grunwald argues that he faces an unacceptable choice: accept the NASD's offer to go forward with the arbitration subject to Grunwald's waiver of the California Ethics Standards thereby forfeiting his right to have his arbitration conducted in accordance with the Ethics Standards; or forfeit his right to a speedy arbitration by refusing the NASD's offer. Grunwald's dilemma is illusory, however, because he never had a right to have his arbitration conducted pursuant to the California Ethics Standards. Because federal law preempts the California Ethics Standards, the Ethics Standards are "without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) ("Since . . . *M'Culloch v. Maryland*, it has been settled that state law that conflicts with federal law is 'without effect.' " (citation omitted) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981))).

Even if the Federal Arbitration Act creates an enforceable right to a speedy arbitration, a contention that we take no position on, Grunwald could have chosen the first option— waiver of the California Ethics Standards in exchange for a speedy arbitration—without forfeiting any right. Instead, Grunwald chose to litigate the issue of whether the California

---

[26]Because we conclude that the Exchange Act preempts application of the California Ethics Standards to NASD arbitrators, we have no need to consider whether the Federal Arbitration Act also preempts application of these standards to NASD arbitrators.

Ethics Standards should apply to NASD arbitrators. As we have explained, Grunwald had no right to an arbitration conducted in accordance with ethics standards that were "without effect." *See id.* at 516. Having refused the option of waiving the California Ethics Standards and proceeding with the NASD arbitration, Grunwald cannot now complain that he was denied a speedy arbitration.

## VI.

Although the district court erroneously concluded that the California Judicial Council acted *ultra vires* when the Judicial Council applied the California Ethics Standards to NASD arbitrators, we agree with the district court's ultimate conclusion that the Ethics Standards do not apply to NASD arbitrations because the Ethics Standards are preempted by the Exchange Act. Accordingly, we affirm.

AFFIRMED.

*APPENDIX*

Standard 7(d)(1)-(14) requires that arbitrators disclose the following information:

(1)   (*Family relationships with party*) The arbitrator or a member of the arbitrator's immediate or extended family is a party, a party's spouse or domestic partner, or an officer, director, or trustee of a party.

(2)   (*Family relationships with lawyer in the arbitration*) The arbitrator or the spouse, former spouse, domestic partner, child, sibling, or parent of the arbitrator or the arbitrator's spouse or domestic partner is:

   (A)   A lawyer in the arbitration.

   (B)   The spouse or domestic partner of a lawyer in the arbitration; or

   (C)   Currently associated in the private practice of law with a lawyer in the arbitration.

(3)   (*Significant personal relationship with party or lawyer for a party*) The arbitrator or a member of the arbitrator's immediate family has or has had a significant personal relationship with any party or lawyer for a party.

(4)   (*Service as arbitrator for a party or lawyer for party*)

   (A)   The arbitrator is serving or, within the preceding five years, has served:

      (i) As a neutral arbitrator in another prior or pending noncollective bargaining case involving a party to the current arbitration or a lawyer for a party;

(ii) As a party-appointed arbitrator in another prior or pending noncollective bargaining case for either a party to the current arbitration or a lawyer for a party; or

(iii) As a neutral arbitrator in another prior or pending noncollective bargaining case in which he or she was selected by a person serving as a party-appointed arbitrator in the current arbitration.

(B) [Case information] If the arbitrator is serving or has served in any of the capacities listed under (A), he or she must disclose:

(i) The names of the parties in each prior or pending case and, where applicable, the name of the attorney representing the party in the current arbitration who is involved in the pending case, who was involved in the prior case, or whose current associate is involved in the pending case or was involved in the prior case.

(ii) The results of each prior case arbitrated to conclusion, including the date of the arbitration award, identification of the prevailing party, the amount of monetary damages awarded, if any, and the names of the parties' attorneys.

(C) [Summary of case information] If the total number of the cases disclosed under (A) is greater than five, the arbitrator must also provide a summary of the cases that states:

(i) The number of pending cases in which the arbitrator is currently serving in each capacity;

(ii) The number of prior cases in which the arbitrator previously served in each capacity;

(iii) The number of prior cases arbitrated to conclusion; and (iv) The number of such prior cases in which the party to the current arbitration, the party represented by the lawyer for a party in the current arbitration, or the party represented by the party-arbitrator in the current arbitration was the prevailing party.

(5) (*Compensated service as other dispute resolution neutral*) The arbitrator is serving or has served as a dispute resolution neutral other than an arbitrator in another pending or prior noncollective bargaining case involving a party or lawyer for a party and the arbitrator received or expects to receive any form of compensation for serving in this capacity.

(A) [Time frame] For purposes of this paragraph (5), 'prior case' means any case in which the arbitrator concluded his or her service as a dispute resolution neutral within two years before the date of the arbitrator's proposed nomination or appointment, but does not include any case in which the arbitrator concluded his or her service before January 1, 2002.

(B) [Case information] If the arbitrator is serving or has served in any of the capacities listed under this paragraph (5), he or she must disclose:

(i) The names of the parties in each prior or pending case and, where applicable, the name of the attorney in the current arbitration who is involved in the pending case, who was involved in the prior case, or whose current associate is involved in the

pending case or was involved in the prior case;

(ii) The dispute resolution neutral capacity (mediator, referee, etc.) in which the arbitrator is serving or served in the case; and

(iii) In each such case in which the arbitrator rendered a decision as a temporary judge or referee, the date of the decision, the prevailing party, the amount of monetary damages awarded, if any, and the names of the parties' attorneys.

(C)  [Summary of case information] If the total number of cases disclosed under this paragraph (5) is greater than five, the arbitrator must also provide a summary of these cases that states:

(i) The number of pending cases in which the arbitrator is currently serving in each capacity;

(ii) The number of prior cases in which the arbitrator previously served in each capacity;

(iii) The number of cases in which the arbitrator rendered a decision as a temporary judge or referee; and

(iv)The number of such prior cases in which the party to the current arbitration or the party represented by the lawyer for a party in the current arbitration was the prevailing party.

(6)   (*Current arrangements for prospective neutral service*) Whether the arbitrator has any current arrangement with a

party concerning prospective employment or other compensated service as a dispute resolution neutral or is participating in or, within the last two years, has participated in discussions regarding such prospective employment or service with a party.

(7)  (*Attorney-client relationships*) Any attorney-client relationship the arbitrator has or has had with a party or lawyer for a party. Attorney-client relationships include the following:

> (A)   An officer, a director, or a trustee of a party is or, within the preceding two years, was a client of the arbitrator in the arbitrator's private practice of law or a client of a lawyer with whom the arbitrator is or was associated in the private practice of law;

> (B)   In any other proceeding involving the same issues, the arbitrator gave advice to a party or a lawyer in the arbitration concerning any matter involved in the arbitration; and

> (C)   The arbitrator served as a lawyer for or as an officer of a public agency which is a party and personally advised or in any way represented the public agency concerning the factual or legal issues in the arbitration.

(8)  (*Other professional relationships*) Any other professional relationship not already disclosed under paragraphs (2)-(7) that the arbitrator or a member of the arbitrator's immediate family has or has had with a party or lawyer for a party. Professional relationships include the following:

> (A)   The arbitrator was associated in the private practice of law with a lawyer in the arbitration within the last two years.

(B)   The arbitrator or a member of the arbitrator's immediate family is or, within the preceding two years, was an employee of or an expert witness or a consultant for a party; and

(C)   The arbitrator or a member of the arbitrator's immediate family is or, within the preceding two years, was an employee of or an expert witness or a consultant for a lawyer in the arbitration.

(9)   (*Financial interests in party*) The arbitrator or a member of the arbitrator's immediate family has a financial interest in a party.

(10)   (*Financial interests in subject of arbitration*) The arbitrator or a member of the arbitrator's immediate family has a financial interest in the subject matter of the arbitration.

(11)   (*Affected interest*) The arbitrator or a member of the arbitrator's immediate family has an interest that could be substantially affected by the outcome of the arbitration.

(12)   (*Knowledge of disputed facts*) The arbitrator or a member of the arbitrator's immediate or extended family has personal knowledge of disputed evidentiary facts relevant to the arbitration. A person who is likely to be a material witness in the proceeding is deemed to have personal knowledge of disputed evidentiary facts concerning the proceeding.

(13)   (*Membership in organizations practicing discrimination*) The arbitrator's membership in any organization that practices invidious discrimination on the basis of race, sex, religion, national origin, or sexual orientation. Membership in a religious organization, an official military organization of the United States, or a nonprofit youth organization need not be disclosed unless it would interfere with the arbitrator's proper conduct of the proceeding or would cause a person

aware of the fact to reasonably entertain a doubt concerning the arbitrator's ability to act impartially.

(14)  Any other matter that:

(A)  Might cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial;

(B)  Leads the proposed arbitrator to believe there is a substantial doubt as to his or her capacity to be impartial, including, but not limited to, bias or prejudice toward a party, lawyer, or law firm in the arbitration; or

(C)  Otherwise leads the arbitrator to believe that his or her disqualification will further the interests of justice.

**Volume 2 of 2**

BERZON, Circuit Judge, concurring in the judgment:

I agree in the main with the majority opinion, with the exception of Section IV(A).[1] With regard to that section, concerning whether the NASD's arbitration and waiver rules as applied to employer/employee disputes are capable of pre-empting state law, I fear that the majority's otherwise cogent discussion oversimplifies the exceedingly challenging issue at the heart of this litigation — the *substantive* extent of the authority of self-regulatory organizations (SROs) to promulgate preemptive rules under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, as amended by the Securities Act Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97.

Nonetheless, as I explain below, the two potential results in this case seem equally plausible and equally imperfect. Given the apparent equipoise, I do not support creating a circuit split with *Drayer v. Krasner*, 572 F.2d 348 (2d Cir. 1978). Thus, while I write separately to explain why I cannot join in Section IV(A) of the majority opinion, I am not sufficiently convinced that the *result* it reaches is wrong to justify dissenting. I therefore concur in the judgment.

---

[1]I also have some disagreement with the methodology, though not the result, of the majority's conflict preemption analysis with regard to the NASD's disqualification rules in Subsection IV(B)(1). The majority asserts that "[b]ecause the NASD Director cannot comply with both sets of disqualification rules, the California Ethics Standards are preempted." *Ante* at 2292. The conflict, however, does not seem to arise out of the NASD Director's inability to comply with both the NASD and state standards. There are no state standards that the NASD Director cannot comply with. The state standards are directed at the arbitrators, and would require them to remove *themselves* from the pool of available arbitrations for a potential case. Instead, the conflict arises from the systems envisioned by the two regulatory schemes, which grant different authority to different players in the arbitration administration process. On this point, I find more convincing the district court's analysis in *Mayo v. Dean Witter Reynolds, Inc.*, 258 F. Supp. 2d 1097, 1105-07 (N.D. Cal.), *as amended*, 260 F. Supp. 2d 979 (N.D. Cal. 2003).

I

My concerns with the majority opinion are easy enough to describe: The majority holds that *any* SRO rule purportedly promulgated under section 19(b)(2) of the Exchange Act, 15 U.S.C. § 78s(b)(2),[2] may preempt contrary state law, including the California Ethics Standards that would otherwise govern the employment arbitration at issue in this case. *See ante* at 2289. Section 19(b)(2), however, is a provision that governs the *procedure* by which an SRO rule is promulgated; on its own, it does not govern the permissible substance of such a rule. The majority thus concludes that *how* an SRO promulgates and the SEC approves (or does not need to approve, *see* Exchange Act § 19(b)(3), 15 U.S.C. § 78s(b)(3)) a rule, rather than the substance of that rule, is solely determinative of its preemptive force. This procedure-centric focus for determining the preemptive force of SRO rules does not address or resolve a substantive question embedded in the Exchange Act as amended in 1975: Are the NASD arbitration and waiver rules *as applied to employer-employee disputes* within the authority of SROs to enact (and the SEC to approve) under section 19(b)(2) in the first place?

SRO rules approved pursuant to section 19(b)(2) must be "consistent with the requirements of [the Exchange Act] and the rules and regulations thereunder applicable to [the SRO]." 15 U.S.C. § 78s(b)(2). These requirements include the registration requirements in sections 6(b)(5) and 15A(b)(6) of the Exchange Act for "exchanges" and "associations" respectively, one of which mandates that "[t]he rules of the [SRO] . . . [must] not [be] designed . . . to regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act] or the administration of the [SRO]." 15 U.S.C. §§ 78f(b)(5), 78o-3(b)(6). In other words,

---

[2]For the sake of convenience, I provide parallel citations to the Exchange Act itself and the corresponding U.S. Code provision throughout.

in its current form, the Exchange Act does not authorize SROs to promulgate *any* rules, let alone preemptive rules, not related either to the purposes of the Act or the administration of the SRO. *See ante at* 2287 n.13; *see also* S. Rep. No. 94-75, at 27-28 (1975), *reprinted in* 1975 U.S.C.C.A.N. 179, 206-07; *cf. Business Roundtable v. SEC*, 905 F.2d 406, 414-15 (D.C. Cir. 1990) (discussing the relationship between section 6(b)(5) and section 19).[3] Thus, whether the NASD had the *substantive* authority, under the Exchange Act, to promulgate the rules at issue here is, in my view, central to the preemption question before us. The majority's analysis almost entirely passes by this potentially determinative issue.

Any discussion of this substantive authority question must begin with *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117 (1973). *Ware* held that the arbitration of employee/employer disputes is outside the "shadow of the federal umbrella" created by the Exchange Act, and is therefore not an area in which SRO rules have preemptive force. Without doubt, *Ware* would control the outcome of this case but for the passage of the Securities Act Amendments of 1975. These Amendments substantially revised the supervisory authority of the Securities and Exchange Commission (SEC) over SRO rulemaking. As the majority recounts, *see ante* at 2284-85, the changes regarding the nature of SEC oversight of SRO rules were extensive. The impact of the 1975 Amendments on the permissible *substantive* reach of SRO rules is much less clear.

We are therefore left with a substantive question deceptively simple in formulation: Did the 1975 Amendments bring employer-employee arbitration procedures such as those at

---

[3] Even before the 1975 Amendments, the Supreme Court had read the interplay between the registration requirements and SROs' rulemaking authority as "establish[ing] the measure of congressionally delegated authority for self-regulation in the national interest." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 134 (1973).

issue both in *Ware* and in this case back *within* the "shadow of the federal umbrella"? If not, then *Ware* still controls, and the California Ethics Standards cannot be preempted by the NASD rules at issue here. If the 1975 Amendments did, however, make *Ware* obsolete on this substantive breadth point, then the majority is correct in its preemption conclusion. Further complicating this inquiry is an important distinction unresolved by *Ware*: In referencing the "shadow of the federal umbrella," *Ware* was unclear as to whether it meant the substantive scope of the Exchange Act or the substantive limits of the SEC's oversight thereunder. Although such a distinction is empty under the current Exchange Act, since the 1975 Amendments expanded SEC oversight to occupy the field of self-regulation, it wasn't at the time of *Ware*.

Only one court, in the thirty years since the 1975 Amendments, has addressed this difficult question with any care. The Second Circuit, in *Drayer*, understood the issue in exactly these terms, and offered two different explanations for why the same New York Stock Exchange rule that was outside the "shadow of the federal umbrella" in *Ware* was moved inside that shadow by the 1975 Amendments. The majority understandably reads *Drayer* for the proposition that "the 1975 Amendments expanded the 'federal umbrella' such that the compulsory arbitration rule now falls within the Act's reach." *Ante* at 2288. What the majority does not examine, however, is whether that holding was correct. As I explain in more detail below, while I agree with the Second Circuit's methodology, I do not agree with some of its conclusions, nor with the extent to which the majority finds its decision controlling here.

II

I begin with the original language of the Exchange Act. As initially enacted, the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881, included one non-preemption provision, section 6(c), which provided that "[n]othing in this title shall

be construed to prevent any exchange from adopting and enforcing any rule not inconsistent with this title and the rules and regulations thereunder and the applicable laws of the State in which it is located."[4] Although the original Exchange Act largely left SROs on their own with regard to rulemaking, as the majority deftly summarizes, the SEC was given supervisory authority, in particular, for thirteen designated subject areas (the last of which was a catchall, "similar matters") where the Commission was authorized to "alter or supplement" SRO rules. *See* Exchange Act § 19(b), 48 Stat. at 898-99; *ante* at 2283-89 n.10. The exercise of oversight, however, even in these discrete areas, was further conditioned on the SEC's determination that "such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange." Exchange Act § 19(b), 48 Stat. at 898. As such, under the Exchange Act as originally enacted, there were three distinct categories of SRO rules: (1) rules over which the SEC exercised substantive oversight; (2) rules within the scope of the Exchange Act over which the SEC did *not* exercise substantive oversight; and (3) rules outside the scope of the Exchange Act.

In *Ware*, the Supreme Court was asked to pass on a question largely analogous to that presented here: "[W]hether certain rules of the New York Stock Exchange [(NYSE)], promulgated as self-regulating measures pursuant to § 6 of the Securities Exchange Act of 1934, and a broker's employee's

---

[4]The remainder of section 6 provided (and still provides) the registration requirements for national securities "exchanges." The Maloney Act of 1938, Pub. L. No. 75-519, ch. 677, 52 Stat. 1070, created the concept of and regulatory structure for national securities "associations," of which the NASD remains today the sole example, by writing new section 15A into the Exchange Act. *See id.*, 52 Stat. at 1070. Tracing the origins of the registration requirements is necessary because, as explained above, the registration requirements for SROs, especially after the 1975 Amendments, place important limits on the substantive scope of SRO rulemaking. *See ante* at 2309-10.

pledge to abide by those rules,[5] pre-empt avenues of wage relief otherwise available to the employee under state law." 414 U.S. at 119 (citation omitted).[6] After surveying the legislative background of the Exchange Act, the Court concluded as follows:

> It is thus clear that the congressional aim in supervised self-regulation is to insure fair dealing and to protect investors from harmful or unfair trading practices. To the extent that any exchange rule or practice contravenes this policy, or any authorized rule or regulation under the Act, the rule may be subject to appropriate federal regulatory supervision or action. Correspondingly, any rule or practice not germane to fair dealing or investor protection would not appear to fall under the shadow of the federal umbrella; it is, instead, subject to applicable state law.

*Id.* at 130-31. Based on this reading of the Exchange Act, *Ware* interpreted the New York Stock Exchange's rule requiring mandatory employer-employee arbitration as falling far enough outside the "federal umbrella," so as not to preempt state law. Stated in broader terms, any SRO rule outside the "shadow of the federal umbrella," according to *Ware*, *cannot* preempt state law.

Importantly, in conducting this analysis, the Court rejected two lines of analysis made by Merrill Lynch and germane here. First, and most significantly, the Court decisively rejected Merrill Lynch's contention that the mandatory

---

[5]The rule at issue in *Ware* required brokers to arbitrate wage disputes with their employers. *See* 414 U.S. at 122 n.3.

[6]The Court had earlier suggested that certain SRO rules could have force only to the extent to which they were directly addressed to the goals of the Exchange Act. *See Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 354-55, 361-62 (1963).

employer-employee arbitration rule fell under the NYSE's obligation to "protect the investing public and to insure just and equitable trade practices."**[7]** *Id*. at 134. As the Court explained:

> Merrill Lynch has not alleged that arbitration will effect fair dealing or result in investor protection. It suggests only that investor confidence not be shaken further by public airing of employer-employee disputes. There is no explanation of why a judicial proceeding, even though public, would undermine investor confidence. It is difficult to understand why muffling a grievance in the cloakroom of arbitration would prevent lessening of confidence in the market. To the contrary, for the generally sophisticated investing public, market confidence may tend to be restored in the light of impartial public court adjudication. Furthermore, it should be apparent that, so far as investor confidence is concerned, compulsory arbitration of an employee-employer grievance is no substitute for direct effective disciplinary action against any abusive exchange practice. Other rules of the Exchange serve this very function.

*Id*. at 135-36.

Second, the Court flatly rejected Merrill Lynch's contention that the arbitration rule was necessary to ensure uniform national regulation. In so holding, *Ware* concluded that:

> There is no revelation in the Act or in any Commission rule or regulation that nationwide uniformity of

---

**[7]**This latter mandate came from section 6 of the Exchange Act. The Court rejected Merrill Lynch's contention, however, that its mandate to "insure just and equitable trade practices" applied to the NYSE arbitration rule, since that language only applied to SRO disciplinary rules under section 6(b) of the original Act. *See Ware*, 414 U.S. at 134 & n.13.

an exchange's housekeeping affairs is necessary or desirable. And Merrill Lynch has not demonstrated that national uniformity in the area of wage claims is vital, in some way, to federal securities policy. Convenience in exchange management may be desirable, but it does not support a plea for uniform application when the rule to be applied is not necessary for the achievement of the national policy objectives reflected in the Act.

*Id.* at 136-37.

All told, *Ware appears* to be a clear holding that only SRO rules intimately related to the fundamental purposes of the Exchange Act — which the Court identified as ensuring fair dealing and investor protection — can preempt state law. *See id.* at 127 ("The principle that emerged from *Silver*, and the premise upon which the Court based its judgment, was that conflicting law, absent repealing or exclusivity provisions, should be pre-empted by exchange self-regulation 'only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act.' " (quoting *Silver*, 373 U.S. at 361)). Because it held that arbitration of employer/employee disputes was not so related, the Court did not allow the NYSE's arbitration rules to preempt California's state arbitration laws.

### III

Just over four years after *Ware*, the Second Circuit reached the diametrically opposite result in *Drayer*. The turnaround was premised entirely on the 1975 Amendments. *Drayer* followed, rather than departed from, *Ware*'s "shadow" approach — that an SRO rule, to have preemptive force, must be within the federal umbrella. *Drayer*, however, offered two different theories for why the "shadow of the federal umbrella" had expanded since 1973.[8]

---

[8]One reason not advanced by any of the parties here for concluding that the 1975 Amendments left the result in *Ware* undisturbed might be

At issue in *Drayer* was NYSE Rule 347, the same rule at issue in *Ware*, which required compulsory arbitration of employee/employer disputes. After observing that section 19(b)(2) of the Exchange Act, as amended by the 1975 Amendments, required that "[r]ule changes proposed by an exchange must be approved by the Commission as being consistent with the requirements of the Act and the rules and regulations thereunder before the changes can become effective," *id.* at 357, *Drayer* concluded that:

> Whatever the relationship of [Rule 347] to the objective of investor protection, it is germane to the goal of market efficiency, reflected in § 6(b) and throughout the 1975 amendments, and to the objective of fair administration of the Exchange, implicated in § 6(b) and an explicit standard of § 19(c). Registered representatives play an important role in the flow of business on securities exchanges. The arbitration

derived from section 28(b) of the Exchange Act, 15 U.S.C. § 78bb(b). That section provides, as here relevant, that: "Nothing in this chapter shall be construed to modify existing law with regard to the binding effect (1) on any member of *or participant in* any self-regulatory organization of any action taken by the authorities of such organization to settle disputes between its members or participants . . . ." (emphasis added).

I emphasize the language added by the 1975 Amendments, the legislative history of which makes clear that this provision was specifically addressed toward preserving the binding effect — or lack thereof — of SRO arbitration rules. *See, e.g.*, H.R. CONF. REP. NO. 94-229, at 111 (1975) ("It was the clear understanding of the conferees that this amendment did not change existing law . . . concerning the effect of arbitration proceeding provisions in agreements entered into by persons dealing with members and participants of self-regulatory organizations."), *reprinted in* 1975 U.S.C.C.A.N. 321, 342; *see also Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 236-37 (1987). Given that *Ware* explicitly held that the NYSE compulsory arbitration rules were binding only to the extent that they did not conflict with state law, this provision, especially in light of the addition of "or participant in" by the 1975 Amendments, may well be read as codifying that result.

provision enables member firms to rid themselves of registered representatives who, as they believe, are dishonest or ineffective, or who have violated rules of the NYSE, including the "know-your-customer" rule, without subjecting themselves to lengthy and costly litigation — including, as here, a request for punitive damages. It is likewise in the interest of fair administration and market efficiency, as well as in the public interest, that honest and ethical registered representatives should have speedy, cheap and effective remedies against their employers. At least, the NYSE is entitled to think this in the absence of any indication otherwise from the SEC.

*Id*. at 358 (citations and footnote omitted). *Drayer* thus expressly departed from *Ware*, at least in part, because (1) it concluded that the 1975 Amendments *added* "market efficiency" and "fair administration of the Exchange" to the purposes of the Exchange Act; and (2) compulsory arbitration implicated these "new" purposes. *See id*. ("With these provisions now the 'measure of congressionally delegated authority for self-regulation in the national interest,' Rule 347 would seem to fall within them." (quoting *Ware*, 414 U.S. at 134)).

*Drayer* also suggested another theory, albeit implicitly, for why the NYSE rule was back within the "shadow of the federal umbrella" after the 1975 Amendments. Unlike the original Exchange Act, which authorized SEC oversight of SRO rulemaking only with regard to twelve discrete subject areas and "similar matters," "the amended Act contains no subject matter restrictions on this authority." *Id*. at 357; *see also id*. at 356 n.9. On this reading, the "shadow of the federal umbrella" described by *Ware* referred to the substantive breadth of the SEC's supervisory authority over SROs, and not to the substantive purposes of the Exchange Act as a whole. As such, in holding the NYSE compulsory arbitration rule to be outside the "shadow of the federal umbrella," this reading suggests that *Ware* held not that it was unrelated to

the purposes of the Exchange Act, but only that it was outside the discrete realm of SEC oversight. Because the 1975 Amendments expanded SEC supervision to cover virtually all areas of Exchange Act self-regulation, this theory posits the alternative argument that, even if the purposes of the Exchange Act were not altered, areas that were not within the "shadow" prior to 1975 could be thereafter. I consider both of these arguments in turn.

## A

The first theory, and the one on which the Second Circuit principally relied, is, in my view, the less plausible of the two. Recall that *Ware* identified two principal purposes behind SRO rulemaking through the Exchange Act — fair dealing and investor protection.[9] The Second Circuit's response in *Drayer* was that "market efficiency" and "fair administration of the Exchange" were additional purposes *added* by the 1975 Amendments, thereby expanding the permissible substantive scope of SRO rules beyond that recognized in *Ware*. *See, e.g.*, 572 F.2d at 358. Seven of the nine provisions of the amended Exchange Act cited in *Drayer* in supprt of the "new purposes" theory arguably went to the "market efficiency" point, and the remaining two addressed the "fair administration of the Exchange" ideal. *See id.* (citing Exchange Act §§ 2, 6(b), 11A(a)(1)(C), 15A(b)(6), 15A(b)(9), 17A(a)(1), 19(c), 19(f), 23(a)(2)).

"[F]air administration" as a *new* statutory purpose cannot pass muster.[10] Section 19(b) of the Exchange Act as originally

---

[9]To a certain degree, the Court had already held as much in *Silver*, 373 U.S. at 352 ("Instead of giving the Commission the power to curb specific instances of abuse, the Act placed in the exchanges a duty to register with the Commission, and decreed that registration could not be granted unless the exchange submitted copies of its rules, and unless such rules were 'just and adequate to insure fair dealing and to protect investors.' " (citations omitted)).

[10]As I explain below, the "fair administration" argument has more pull under *Drayer*'s second theory — as relating to the expanded substantive breadth of SEC oversight over SRO rulemaking.

enacted had already provided "insur[ing] fair administration of [the] exchange" as one basis for the SEC to alter or supplement an SRO's rules. *See* Exchange Act § 19(b), 48 Stat. at 898. In other words, the version of the Exchange Act before the Court in *Ware* already included this "fair administration" concept as an animating principle with regard to SEC oversight. The Court in *Ware* did not view that concept as informing the preemption analysis. Instead, the Court held that rules concerning "an exchange's housekeeping affairs" or "[c]onvenience in exchange management" were not preemptive. *Ware*, 414 U.S. at 136.

As to "market efficiency," the alternative added Exchange Act purpose posited in *Drayer*, a close reading of the text of the Amendments and the relevant legislative history suggests that instead of adding "market efficiency" as a new independent purpose of the Exchange Act, the 1975 Amendments clarified what "fair dealing" and "investor protection" actually meant under the original Exchange Act.

1

For its conclusion that "market efficiency" was added to the Exchange Act as a new purpose justifying the preemptive force of the employer-employee arbitration rule, *Drayer* relied on seven provisions of the Exchange Act, as amended. *See* 572 F.2d at 358 ("Whatever the relationship of this rule to the objective of investor protection, it is germane to the goal of market efficiency, reflected in § 6(b) and throughout the 1975 amendments, see, e.g., §§ 2; 11A(a)(1)(C); 15A(b)(6); (9); 17A(a)(1); 19(f); 23(a)(2) . . . ."). Five provide, at best, only weak support for *Drayer*'s conclusion that "market efficiency" was a "new" purpose added by the 1975 Amendments. For example, section 11A(a)(1)(C), 15 U.S.C. § 78k-1(a)(1)(C), provides only that "[i]t is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure" five different goals concerning the establishment of a national securities

market, including the "economically efficient execution of securities transactions." 15 U.S.C. § 78k-1(a)(1)(C)(i). Similarly, new section 17A(a)(1)(A) of the Exchange Act provides that "[t]he prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors." 15 U.S.C. § 78q-1(a)(1)(A). Two of the cited provisions speak only of the extent to which SEC and SRO rules should not unnecessarily burden competition. *See* Exchange Act §§ 15A(b)(9), 23(a)(2), 15 U.S.C. §§ 78*o*-3(b)(9), 78w(a)(2). Another provides nothing more relevant than an abstract reference to "the purposes of this title." Exchange Act § 19(f), 15 U.S.C. § 78s(f).

Two provisions, however, provided somewhat firmer footing for the market efficiency argument: Section 2 of the Exchange Act, 15 U.S.C. § 78b, and the revisions to the registration requirements for associations in section 15A(b)(6) of the Exchange Act, 15 U.S.C. § 78*o*-3(b)(6).[11] These sections require closer scrutiny.

Section 2 of the Exchange Act, as enacted in 1934, provided that:

> transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, including transactions by officers, directors, and principal security holders, to

---

[11]*Drayer* only cited the amended registration requirements for *associations*, but the 1975 Amendments similarly rewrote the registration requirements for exchanges as well. *See* Exchange Act § 6(b)(5), 15 U.S.C. § 78f(b)(5).

require appropriate reports, and to impose require-
ments necessary to make such regulation and control
reasonably complete and effective, in order to pro-
tect interstate commerce, the national credit, the Fed-
eral taxing power, to protect and make more
effective the national banking system and Federal
Reserve System, and to insure the maintenance of
fair and honest markets in such transactions . . . .

Exchange Act § 2, 48 Stat. at 881-82. The revision to section
2 in the 1975 Amendments added "to remove impediments to
and perfect the mechanisms of a national market system for
securities and a national system for the clearance and settle-
ment of securities transactions and the safeguarding of securi-
ties and funds related thereto" after "to require appropriate
reports." *See* Securities Act Amendments of 1975 § 2, 89 Stat.
at 97, 15 U.S.C. § 78b. This provision might have indicated
an intent to codify "market efficiency" as a *new* purpose of
the Exchange Act, but for the extent to which the amendments
to sections 11A(c) and 17A(a)(1)(A), already discussed
above, linked these goals to "investor protection." *See*
Exchange Act §§ 11A(a)(1)(C), 17A(a)(1)(A), 15 U.S.C.
§§ 78k-1(a)(1)(C), 78q-1(a)(1)(A). Given those later provi-
sions, however, the addition of the "national market system"
language to section 2 by the 1975 Amendments supports the
contrary conclusion — that the 1975 Amendments meant to
clarify the scope of the Act, not to broaden it.

All that is left, then, to support *Drayer*'s assertion that
"market efficiency" became a *new* purpose of the Exchange
Act through the 1975 Amendments are the revised registration
requirements. Most of the language in these requirements,
however, had its origins in the Maloney Act of 1938, *not* in
the 1975 Amendments.[12] With only that language which was

---

[12]An important distinction, albeit one immaterial to this analysis, is that
the Maloney Act applied only to "associations." *See ante* at 2273 n.6.
Thus, unlike the NASD, the NYSE, the SRO at issue in both *Ware* and
*Drayer*, was not subject to many of these registration requirements prior
to 1975.

not included in the Exchange Act in 1938 emphasized, the 1975 Amendments rewrote sections 6(b)(5) and 15A(b)(6) of the Exchange Act to require that:

> The rules of the [SRO] are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, *to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities*, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, [to fix minimum profits, to impose any schedule or fix rates of commissions, allowances, discounts, or other fees to be charged by its members[13]], *or to regulate by virtue of any authority conferred by this title matters not related to the purposes of this title or the administration of the* [SRO].

15 U.S.C. §§ 78f(b)(5), 78*o*-3(b)(6) (emphasis added).[14] The latter of the two new passages closed the procedural preemption loophole in the pre-1975 version of the Act, by barring the possibility that SROs could promulgate rules "not related to the purposes of [the Exchange Act] or the administration of the [SRO]." To conclude that we may discern, from the former addition, a clear congressional intent to add a "new" mar-

---

[13]This bracketed material appears only in the registration requirements for associations — section 15A(b)(6), 15 U.S.C. § 78*o*-3(b)(6).

[14]For the language from which this comparison was made, *see* Maloney Act of 1938, 52 Stat. at 1071 (formerly codified at 15 U.S.C. § 78*o*-3(b)(7) (1970)). The pre-1975 provisions placed the language in somewhat different order; I have here only indicated that language which was added in its entirety.

ket efficiency ideal to the Exchange Act seems at best a dubious proposition, particularly in light of the extent to which the other amended provisions tied these concepts to "investor protection."

2

The relevant legislative history behind the 1975 Amendments is not much more illuminating, though it seems to run, at least to some degree, against *Drayer*'s expansion-of-statutory-purpose thesis. One of the major impetuses for the Amendments was concern that the SROs were not sufficiently subject to federal regulation, by either Congress or the SEC. *See, e.g.*, S. Rep. No. 94-75, at 2 ("Meaningful reform of this country's securities trading mechanism will . . . be impossible unless there is also reform of the method and manner by which the self-regulatory organizations operate and in the way that the SEC oversees the performance of their regulatory responsibilities."), *reprinted in* 1975 U.S.C.C.A.N. at 181. Thus, a principal purpose of the 1975 Amendments was to provide more SEC oversight over SRO rules. *See, e.g.*, *id.* at 28-30, *reprinted in* 1975 U.S.C.C.A.N. at 207-08.

As the authoritative Senate Report accompanying the Amendments explained:

> The basic goals of the Exchange Act *remain* salutary and unchallenged: to provide fair and honest mechanisms for the pricing of securities, to assure that dealing in securities is fair and without undue preferences or advantages among investors, to ensure that securities can be purchased and sold at economically efficient transaction costs, and to provide, to the maximum degree practicable, markets that are open and orderly. S. 249 is an important step in assuring that the securities markets and the regulations of the securities industry remain strong and capable of fos-

tering these fundamental goals under changing economic and technological conditions.

*Id.* at 3, *reprinted in* 1975 U.S.C.C.A.N. at 182 (emphasis added); *see also id.* at 22, *reprinted in* 1975 U.S.C.C.A.N. at 200 ("S. 249 contains a number of provisions which would *clarify* the scope of the self-regulatory responsibilities of national securities exchanges and registered securities associations . . . and the manner in which they are to exercise those responsibilities. The bill would also *clarify and strengthen* the Commission's oversight role with respect to the self-regulatory organizations." (emphases added)). Thus, the intent behind the Amendments, according to the Senate Report, was *not* to expand the field in which SROs could promulgate rules but "to strengthen the total regulatory fabric." *Id.* at 23, *reprinted in* 1975 U.S.C.C.A.N. at 202; *see also id.* at 27, *reprinted in* 1975 U.S.C.C.A.N. at 205 ("The Committee believes that the statutory pattern governing the scope of the NASD's authority is basically sound.").

Moreover, the Senate Report suggested that, if anything, the Amendments were meant to *narrow* the substantive scope of SRO rulemaking within the fixed confines of the Act:

> The bill would eliminate present Section 6(c) and the open-ended authority it grants to the exchanges, and it would limit by Sections 6(b)(5) and 15A(b)(6) the scope of the self-regulatory organizations' authority over their members to matters related to the purposes of the Exchange Act. The growing diversification of securities firms into non-securities activities has raised, and will continue to raise, significant questions about the adequacy of the present regulatory structure. However, the diversification of securities firms should not automatically extend the jurisdiction of the self-regulatory agencies. Until it is specifically demonstrated to the Congress that the non-securities activities of firms which are members of

self-regulatory agencies should be limited or regu-
lated in the public interest, such firms should be free
to undertake and pursue these activities in the same
manner as other business organizations, subject only
to those regulatory limitations necessary to assure
protection of public investors and the public interest.

*Id*. at 28, *reprinted in* 1975 U.S.C.C.A.N. at 206-07. Although
this passage relates more directly to the resolution of the pro-
cedural preemption question described above, *see ante* at
2309-10, this language, and the Senate Report as a whole,
suggests that an area of regulation unrelated to the purposes
of the Exchange Act before the Amendments *remained* unre-
lated afterwards.

3

Finally, even if these amendments can be said to have cre-
ated a new "purpose" for supervised self-regulation under the
Exchange Act, which I doubt, I have a hard time understand-
ing how employee/employer arbitration is related to "*market
efficiency.*" True, arbitrating rather than litigating employer-
employee disputes may in some sense make the market for
registered securities employees more efficient, by decreasing
the transaction costs involved in discharging such employees
and replacing them with others. But, as the legislative lan-
guage and history just discussed highlights, the Exchange Act
regulates the *securities* market, not the *employment* market. It
is plain from the language of the statute that it is the facilita-
tion of transactions within a *national securities* market with
which the statute is concerned.[15]

_____

[15]As this discussion should make clear, it is entirely possible that appli-
cation of the SRO arbitration rules in other contexts, such as arbitration
disputes between the SRO and its members, or between members and
investors, *would* come within the statutory purposes. *See, e.g.*, *Wilmot v.
McNabb*, 269 F. Supp. 2d 1203, 1206-07 (N.D. Cal. 2003); *Mayo*, 258 F.
Supp. 2d at 1105-12. My concern here is only with the NASD's arbitration
rules as they pertain to internal employment disputes between an SRO
member and one of its employees.

It is therefore difficult to conclude, as *Drayer* did, that employee/employer arbitration disputes such as those at issue there, in *Ware*, and in this case, are now within the "shadow of the federal umbrella" solely because they implicate "market efficiency."

B

A more subtle, alternative ground for *Drayer*'s conclusion was that *Ware*'s concept of the "federal umbrella" described not the purposes of the Exchange Act but the substantive breadth of the SEC's supervisory authority over SROs under the original language of the Exchange Act. This premise suggests that the Amendments necessarily substantively broadened the "shadow of the federal umbrella" at the core of *Ware not* by altering the core purposes of the Exchange Act, but by expanding the substantive scope of the SEC's oversight. Because it is beyond question that the 1975 Amendments greatly increased the scope of SEC supervision over SROs, it is at this point where I find resolution of this case difficult. *Ware*, in my view, seems susceptible of two mutually exclusive interpretations.

What is unclear is the relationship between *Ware*'s assertion that the NYSE's compulsory arbitration rule did not implicate the core purposes of the Exchange Act, and its partial reliance on the fact that the SEC lacked oversight over such a rule under the pre-1975 Exchange Act. *See, e.g.*, 414 U.S. at 135 n.14 ("None of the subject matter categories suggests that the Commission has review authority with respect to a rule requiring arbitration of employer-employee disputes."). At some points in *Ware*, it appears that the Court meant, through the term "federal umbrella," to refer only to the limited substantive scope of SEC oversight over SRO rules. At other points, the *Ware* Court seemed plainly to be considering the broader purposes of the Exchange Act, without regard to the precise scope of SEC oversight. Because the SEC's oversight authority now occupies the entire field of

Exchange Act self-regulation, as it did not before 1975, it now matters, as it did not at the time of *Ware*, whether the "shadow of the federal umbrella" was cast only as far as SEC oversight, or covered the whole realm of authorized SRO self-regulation.

As I have already discussed, *Ware was* clear that arbitration did *not* implicate "fair dealing" or "investor protection," the two central purposes of the Exchange Act identified in *Silver*. What *Ware* was less clear about was the relationship between arbitration and the concept of "fair administration of the Exchange." *See id.* at 136-37 (quoted *ante* at 2314-15).

"Fair administration" appeared in the 1934 Act only in section 19(b), which, as noted above, provided for twelve subject-matter areas (and "similar matters") over which the SEC could exercise oversight by "alter[ing] or supplement[-ing] the rules of [the] exchange." The SEC could alter or supplement rules related to those subject matters, however, if the change was "necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange." Exchange Act § 19(b), 48 Stat. at 898. Without referring to the "fair administration of such exchange" language in the then-extant section 19(b), *Ware* concluded that "[t]here is no revelation in the Act or in any Commission rule or regulation that nationwide uniformity of an exchange's housekeeping affairs is necessary or desirable." 414 U.S. at 136. This conclusion may well have been premised on the understanding that "fair administration of such exchange" does *not* include such "housekeeping affairs" as the manner in which members of the exchange settle disputes with their employees.

"Fair administration of such exchange" could well be interpreted — indeed, were we writing on a clean slate, I would so interpret it — as pertaining to exchange-wide administrative matters. The pre-1975 version of section 19(b), for exam-

ple, listed as within the SEC's oversight authority matters including "hours of trading," and "the time and method of making settlements, payments, and deliveries." The internal affairs of *members* of the exchanges and associations, in contrast, *Ware* may well have concluded, are not within the scope of "fair administration of such exchange," and are thus outside the Act's "federal umbrella." On the other hand, *Ware* may have reflected only the conclusion that "housekeeping affairs" concerning members of exchanges, as opposed to the exchanges as a whole, were not among the listed areas of SEC oversight.

Neither *Drayer* nor the majority address what *Ware* meant by "housekeeping affairs." Neither explains why *Ware*'s holding that "housekeeping affairs" were beyond the area in which there is a need for national uniformity was altered by the 1975 Amendments. Both *Drayer* and the majority do appear, without so stating, to *assume* that the "housekeeping affairs" are within the "federal umbrella" after 1975 because of the provisions that allow — but do not *always* require — SEC oversight of SRO administrative rules. *See, e.g.*, Exchange Act § 19(b)(3)(A)(ii), (c), 15 U.S.C. § 78s(b)(3)(A)(ii), (c). But this unstated assumption rests on another, similarly unstated, premise — that *Ware* tossed aside the "housekeeping" rules because they were then beyond the SEC's oversight authority, not because they were outside the Act's purposes altogether. If the latter were the case, nothing in the 1975 Amendments would matter. As noted earlier, "fair administration of [the] exchange" was *not* a new addition in 1975.

*Ware* is indeed ambiguous on this key point. Because my two colleagues have chosen to rely on *Drayer*, however, and because I cannot conclude with any reasonable certainty that the *result* in *Drayer* is necessarily wrong given the above-articulated concerns, the only prudent course of action for me is to set out my views in detail, as I have done, and to concur in the judgment, while remaining *dubitante*. *See* Lon L. Fuller, Anatomy of the Law 147 (1968) ("[E]xpressing the

epitome of the common law spirit, there is the opinion entered *dubitante* — the judge is unhappy about some aspect of the decision rendered, but cannot quite bring himself to record an open dissent.").